No. 32,218

FRANK SHUMWAY, *Appellee*, v. ROBERT L. SHUMWAY et al.,
*Appellants*.

(44 P. 2d 247)

Opinion filed
May 4, 1935.

*A. Harry Crane, Ward D. Martin, John S. Dean, John S. Dean, Jr.,* and *Mark L. Bennett,* all of Topeka, for the appellants.

*E. R. Sloan, W. Glenn Hamilton, Floyd A. Sloan* and *Eldon R. Sloan,* all of Topeka, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action to establish a trust and declare it to be a lien upon the estate of the father of the plaintiff and also upon real property which the father conveyed shortly before his death to children of his second marriage. The trial court found in favor of the plaintiff that a trust had been created for the benefit of the plaintiff in the hands of his father, and rendered judgment for plaintiff making it a lien upon the estate and the land conveyed to the other children. These other children and the administrator appeal.

The trial court made findings of fact and conclusions of law. The first three findings give a history of the situation leading up to the important facts with reference to the existence of a trust, which facts may be briefly stated as follows: Simon B. Shumway, the father of the plaintiff and defendants, except the administrator, married Carrie Van Gasbeck in 1881 and lived in Jefferson county five or six years; they then went farther west, taking with them their son, the plaintiff, who was born in 1882. They remained West only for about one year and returned and lived with the wife's father, Frank Van Gasbeck, and family, for about two years. They had neither prop-

836

erty nor funds other than two or three horses and a few household goods when they returned. Frank Van Gasbeck furnished his daughter with personal property and money with which to buy cattle and the Allen farm, consisting of 99 acres, on which they moved and established their home. Carrie Shumway died in a few months after moving on the Allen farm, leaving her husband and Frank, the plaintiff, as her only child. There was no administration of her estate, but her husband converted both real and personal property into cash, and about two years later married again, and the defendants, except the administrator, are the three children of the. second marriage. The second wife died in 1927, and Simon B. Shumway died in January, 1933.

The following are the fourth and fifth findings of fact:

"That, after the second marriage of Simon B. Shumway and in the year 1895 or 1896 the said Simon B. Shumway and Frank Van Gasbeck, the father of Carrie Shumway and grandfather of this plaintiff, met in the store and post-office at North Cedar in Jefferson county, Kansas, at which time a conversation was had between the two, relative to Frank Shumway's interest in his mother's estate, and as to the method of handling the same, in which conversation it was stated by Simon B. Shumway that the son's interest in his mother's estate amounted to the sum of $2,500, and that such an amount was agreed by the said Simon B. Shumway and Frank Van Gasbeck as the son's proper share, and that Simon B. Shumway stated that he was holding said sum for Frank and would turn it over to him at the proper time, to which arrangement Frank Van Gasbeck agreed.

"That said sum of $2,500 was kept by Simon B. Shumway in a separate fund and was invested and reinvested by said Simon B. Shumway and that in the fall of 1926 plaintiff was informed by his father that said sum of $2,500 was then invested in bonds issued by the Capper Publications and that said money would be paid to plaintiff the following spring; that in the spring of 1927 plaintiff was informed by his father that said fund had been withdrawn from the Capper Publications and had been reinvested in a loan of $2,500 made to one John Coleman; that in September, 1932, plaintiff was informed by his father that John Coleman had paid said sum of $2,500 but that he the said Simon B. Shumway had used the same for necessary expenditures, including the taking back of a farm and the paying of taxes, but that said sum of $2,500 would be delivered to plaintiff by said Simon B. Shumway and that plaintiff would not lose a penny by reason of his having used the same. So far as the evidence discloses this was the first time the said Simon B. Shumway had used said money for his own use and benefit. That no part of said sum of $2,500 has been paid to plaintiff."

The trial court concluded and rendered judgment as above stated in favor of the plaintiff. It will be observed from the above findings that there was no writing in connection with any arrangement.

for the father to pay the son Frank $2,500, and his oral promise was in substance that he was holding that sum for Frank and would turn it over to him at the proper time. This statement and promise was made about four or five years after his first wife's death and when Frank was about fourteen years of age. The next incident we have in connection with the matter was thirty or thirty-one years later in 1926, at which time the money was said to have been invested in bonds of the Capper Publications. A year later the money was said to have been loaned to John Coleman, and five years later, in 1932, the father told the plaintiff that he had used the funds for necessary expenditures. This action was commenced on June 12, 1933.

As neither party to this action claims the promise related to real property, an oral agreement may create a trust. (*Hoover v. Hopkins,* 122 Kan. 65, 251 Pac. 411; *Diller v. Kilgore,* 135 Kan. 200, 9 P. 2d 643; and *Stahl v. Stevenson,* 102 Kan. 844, 171 Pac. 1164.)

With reference to the findings of fact made by the trial court, our only duty is to determine from the record whether or not they are supported by substantial testimony, and we are accepting them as being sufficiently supported, although we do fail to find very strong evidence in support of the first part of the first sentence in finding No. 5, which is as follows: "That said sum of $2,500 was kept by Simon B. Shumway in a separate fund and was invested and reinvested by said Simon B. Shumway."

Accepting the findings as made by the trial court as supported by the evidence, the only other question before this court on review is a legal one as to the facts stated in the findings constituting a trust. It is said in 65 C. J. 231 that—

". . . to constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created, accompanied with an intention to create a trust, followed by an actual conveyance or transfer of lawful, definite property or estate or interest, made by a person capable of making a transfer thereof, for a definite term, vesting the legal title presently in a person capable of holding it, to hold as trustee for the benefit of a *cestui que trust* or purpose to which the trust fund is to be applied; or a retention of title by the owner under circumstances which clearly and unequivocally disclose an intent to hold for the use of another. . . . Considered from the standpoint of parties, an express trust implies a coöperation of three persons: (1) A settlor, or a person who creates or establishes a trust. (2) A trustee, or person who takes and holds the legal title to the trust property for the benefit of another. (3) A *cestui que trust* or person for whose benefit the trust is created."

There is no difficulty in locating the trustee and the *cestui que*

*trust* in this case, but it is not so certain about the grandfather being the settlor, or the person who created or established the trust. The findings show that he furnished the funds with which his daughter purchased the farm and live stock some four or five years before the conversation was had in which the promise was made to him by his son-in-law, which is claimed to constitute the trust, and the daughter had been dead four or five years and her husband had sold all her property, real and personal, without administering upon her estate, so it is difficult to see what supervision, authority or control the grandfather would have over any of the proceeds of his daughter's property even if he had originally given it to her. But this feature of the case is easily solved by the fact that a donor or settlor in creating a trust may make himself the trustee as it is stated in all the texts on the subject. (See 1 Bogert on Trusts and Trustees, p. 5.)

It was therefore possible for Simon B. Shumway, possessing the proceeds of the property formerly belonging to his wife, to create a trust in favor of his son, the plaintiff, and appoint himself trustee to carry out the trust. We can, therefore, leave the question of parties and consider whether or not the promise made by the father of the plaintiff fully meets the outlined and necessary terms of a trust as above quoted from Corpus Juris. Especially, Was the promise an explicit declaration of trust or that a trust was intended to be created and was it followed by an actual transfer of lawful, definite property, estate or interest which was to be held by such person as a trustee? Even if the settlor was also the trustee, there appears to. be three definite and important features necessary to create in himself a trust—the explicit declaration and intention to create such, the transfer of lawful and definite property and the requirement to hold such as trustee.

Appellee in support of the trial court's conclusion that this was a trust cites *Tenney v. Simpson,* 37 Kan. 579, 15 Pac. 512, where it was held:

"No particular form of expression is required to create an express trust, nor need all the terms and conditions of the trust be declared in a single writing." (Syl. ¶ 2.)

Appellee also cites the following three cases from other states, viz., *Knagenhjelm v. R. I. Hospital Trust Co.,* 43 R. I. 559, *Eshbach's Estate,* 197 Pa. 153, and *Hamer v. Sidway,* 124 N. Y. 538, all of which were concerning promises made in writing.

In the Rhode Island case 422 shares of stock of a certain corpo--

ration came into the hands of the administrator of the estate of the former owner of them, where the testator by a deed of trust quite a while before his death established a trust in favor of the plaintiff who was not to receive any benefits, however, until after the testator's death, and it was there held that the words, "I hereby declare to be held in trust" show an intention to give the beneficial interest *in praesenti,* and such beneficial interest having been created, the character of the trust is not changed by the fact that the beneficiary is not entitled to receive possession of the trust property until the death of the donor, and it was further held in the opinion:

"It is enough if, having the property he conveys it to another in trust, or, the property being personal, if he unequivocally declares, either orally or in writing, that he holds it *in præsenti* in trust, or as a trustee for another." (p. 567.)

The Pennsylvania case was where—

"A father executed a writing in which he declared that he held $2,000 of his daughter's money, that she was to receive interest thereon during her life, and that at her death the principal should be paid to her children. The payment of one year's interest was indorsed upon the paper, and the paper was found amongst the father's effects after his death. *Held,* that the paper constituted the father a trustee for his daughter and her children." (Syl.)

In the opinion it was further stated that the donor relinquished his ownership of or dominion over the money and constituted himself a trustee of the fund clearly and explicitly.

The New York case was where an uncle had agreed with his nephew that "if he would refrain from drinking liquor, using tobacco, swearing and playing cards or billiards for money until he should become twenty-one years of age he would pay him $5,000." The nephew performed his part of the agreement and became of age in 1875, and wrote his uncle advising him of full performance on his part. The uncle replied by letter admitting the agreement and stating "that he had the money in bank, set apart, which he proposed to hold for W. (the nephew) until the latter was capable of taking care of it." It was thereupon agreed between the parties that the money should remain in the hands of S. (the uncle) on interest. In an action upon the agreement it was held, "that it was founded upon a good consideration and was valid and enforceable" and "that under the agreement made in 1875, the relation of the parties thereafter was not that of debtor and creditor, but of trustee and *cestui que trust.*" In the opinion in that case the court further said:

"At the time the uncle wrote the letter he was indebted to his nephew in the sum of $5,000, and payment had been requested. The uncle, recognizing the indebtedness, wrote the nephew that he would keep the money until he deemed him capable of taking care of it. He did not say 'I will pay you at some other time,' or use language that would indicate that the relation of debtor and creditor would continue. On the contrary, his language indicated that he had set apart the money the nephew had 'earned' for him so that when he should be capable of taking care of it he should receive it with interest." (p. 550.)

In the case of *Greenwood v. Greenwood*, 97 Kan. 380, 155 Pac. 807, a decree of court in a divorce case was under consideration as creating a trust, and was compared with a similar decree of divorce in the case of *Arnold v. Arnold*, 83 Kan. 539, 112 Pac. 163, where the decree in the latter case provided for the use of the property to be for the care and benefit of the children, and in the former provided for the remainder, and the court said in the opinion:

"Because the decree is utterly barren of any description of the nature and purpose of the trust, it fails to meet the requirement of a declaration of trust." (p. 389.)

In the case of *Staples v. Murray*, 124 Kan. 730, 262 Pac. 558, a brother of a soldier accepted the trusteeship and promised to carry out the trust as declared by the soldier for the benefit of his own stepson, in one-half the war-risk insurance he held. Later the soldier declared a revocation and—

"In an action by the infant to impose a trust upon one-half of the fund it is held that the request of the soldier did not vest a present property right in the stepson and that his original request did not amount to a complete and executed trust beyond the power of revocation." (Syl.)

In the *per curiam* opinion in the case of *Hull v. Hull*, 78 Kan. 886, 96 Pac. 1118, it was said:

"The written agreement involved in these cases no more creates a trust than would a promissory note. There was no intention of a trust, no expression of a trust, no fiduciary or confidential relation between the parties, and no circumstances out of which a trust could have resulted or be implied."

Of the three cases cited above from other states the one from Pennsylvania is the only one which did not specifically designate the identical property that was being held, and in that case the payment of the first year's interest was indorsed on the written document that created the trust which helped to show the intention. In all of those cases cited above from other states there was specific or unequivocal language showing intention to treat the property as a trust. In the

New York case the court said until the exchange of letters definitely setting the fund aside for a specific purpose it was merely an indebtedness and the relation of debtor and creditor only existed.

In 26 R. C. L. 1180 it is said:

"To constitute an express trust, there must be either explicit language to that effect or circumstances which show with reasonable certainty that a trust was intended to be created. The legal owner of property is *prima facie* entitled to its beneficial enjoyment, and to convert him into a trustee there must be a sufficient indication of the intention of the parties that he is to hold for the benefit of others."

This and subsequent sections show the necessity of unmistakable intention to hold the property in trust, although the word "trust" need not be used, and such intention is confirmed by the subsequent acts of the trustee. This is one of the weak points about the transaction in the case at bar being a trust. A period of thirty or thirty-one years passed before we again hear of any steps to effectuate it.

In 1 Bogert on Trusts and Trustees, page 195, under the heading of The Existence and Expression of a Trust Intent, it is said:

"This second element is believed to be the existence in the mind of the settlor of an intention that he himself or some other person shall be a trustee, and the expression of that intent. This intent is commonly referred to as the 'trust intent.' If it exists secretly, surely no trust will begin. And, similarly, the expression of what purports to be a trust intent will not give rise to a trust unless that intent actually existed."

On pages 200 and 201 of the same volume numerous instances are given in application of this rule.

In 65 C. J. 218 it is said:

"It is fundamentally essential to the existence of any trust that there be a trust *res* or subject matter and that there be a separation of the legal estate from the beneficial enjoyment."

On page 304 it is further said as to trust intent:

"In order to create an express trust in such a case the essentials of a trust must exist, including the intention to create a trust. Such transactions are not to be confused with those creating or intending to create some relation other than that of trustee and *cestui que trust*, and the facts in some cases, although involving transactions between persons related to each other or occupying confidential relations, have been held insufficient to create an express trust, but to create, at the most, a mere debt."

Also in the same volume, on page 279, it is said:

"Such intention must be made apparent in an unequivocal manner, and while, in accordance with the general rule, any words which indicate with sufficient certainty an intention to create a trust will be effective without the use of the

words 'trust' or 'trustees,' or, as sometimes stated, without declaring the trust in express terms, the mere expression of an intention, or an intention not carried into effect, to create a trust is not sufficient, and a written statement sufficient in form will not control in the absence of an intention to create a trust."

We cannot help but conclude that there is a decided shortage in the facts as found by the trial court in meeting the three essential requirements of the law in creating a trust, viz., the explicit declaration and intention to create a trust, definite property or subject matter of the trust and the subsequent holding of it by the trustee as a trust, and while the long time intervening may not preclude the beneficiary from enforcing an unquestionable trust, as the authorities cited maintain, yet the immediate and subsequent conduct of the trustee in handling and using the subject matter goes strongly toward dispelling any thought or intention on the part of the settlor of creating a trust, appointing himself trustee or conducting himself as trustee in the handling of the subject matter.

We think the conclusion of the trial court in holding that the facts found constituted a trust and showed the creation of a trust was wrong.

Of course, if it was not a trust the statute of limitations would run against the claim as a debt, and the action would be thereby barred.

The judgment as to the trust is reversed.